May it please the Court. Frank McCabe, and with me is Neoma Kenwood for Petitioner Mickey. And I would like to take about 15 minutes, maybe a little more, talking about the penalty phase of the case. Ms. Kenwood, we take a few minutes regarding guilt phase, and then we would ask to reserve about 7 minutes of our 30 minutes for rebuttal. Our questions may make your well-intentioned plans a little complicated, but in any event, let's go. May it please the Court. This case illustrates an incredible lack of preparation for the guilt, for the penalty phase of the trial. Both attorneys were appointed by February of 1981. Two years later, they engaged the National Jury Project to assist them on selection of a jury. And they met with the National Jury Project for the first time in the middle of March of 1983, two years after they'd been appointed and less than two months before the trial was to commence. At that time, they had an amazing lack of information and misinformation about Petitioner Mickey's background and his family. For example, they erroneously thought that two of his grandparents were alive. They erroneously thought that his grandmother was senile. They had no information about his brother's suicide that had occurred many years before. They thought his half-brother was alive, but he had died a year earlier before they ever interviewed him. And they had absolutely no idea of how old Mickey was when his mother died. Judge White noted in the penalty phase of a capital trial, counsel has a duty to perform a thorough investigation, but this was never done here. On the day the jury selection was to begin, trial counsel asked for a continuance, and he said, we have in essence nothing for the penalty phase of this case. They got a one-day continuance because court counsel was sick. But the next day, the lead counsel elaborated and said he had 50 potential witnesses to interview that the defendant had given him. And the prosecutor, who obviously opposed any continuance, said, well, Mr. Mickey had these witnesses for a long time. The reason, counsel said, is, well, there are mitigation witnesses and Mr. Mickey didn't understand the mitigation part of the case. The reason he didn't understand is the counsel himself didn't understand the necessity of interviewing mitigation witnesses. Five days later, Mr. Mickey himself personally addressed the judge. And he said, I have given my lawyers a list a long time ago of witnesses, and to my knowledge, 75 percent of them have never been interviewed. I don't even know if I have a defense in either the guilt or the penalty phase. A few days later, he again addressed the court, and he said, it's only become obvious to me now that my lawyers are totally unprepared. Two years ago, I gave them a list of witnesses. They haven't interviewed these people in two years, and these are witnesses that are here in California. Now — Counsel, assuming we agree with you, why is there prejudice? There's prejudice because, as the court knows, there were 30 witnesses that were called. But they were — they presented not just an incomplete case, but an inaccurate case. And — and what this allowed is for the prosecutor to — What is it that the witnesses you contend were omitted would have provided that was not provided with the witnesses presented? They would have provided evidence that the Mickey family, he had — he had generations of alcoholism, mental health problems, and a terrible home life. What was presented was the exact opposite. What was presented was that he came from a nice home life, that he was a nice boy that somehow turned to alcohol and drugs. Well, don't we have a problem of contradiction between the strategy in the guilt phase compared to the strategy in the penalty phase? For — for perfectly reasonable strategic reasons, it might have been desirable to create the impression that this person was, as you say — Well, I think to look at whether there's a reasonable strategic reason, that comes into play after the attorneys have done an adequate and complete investigation. In a strategy that's not based on a complete investigation, there is no reason to defer it, I think, the — to defer to it, as the Wiggins case has said. The real problem here, or a real problem here, is the prosecutor, in his closing argument at the guilt phase, said to the jury, Mickey had the benefit of growing up in a fairly good environment. His relationship — Kennedy. Please, I didn't get you. You were looking down. I didn't get your voice. I'm sorry. Mickey had the benefit of growing up in a fairly good environment. His relationship with his father continued to be good. He had good people around him, had he wanted to rely upon them. The problem was that this was not true. He didn't grow up in a fairly good environment. He didn't have a good relationship with his father. For example, his father was a very heavy drinker. His father killed the defendant's dog. They lived out in a rural area. His dog was his closest companion. He had him for nine years. The father shot him. There were a lot of cats around this rural property. The father said, you pick the ones that go to the pound. So he had to pick which of his pets would go. Took them to the pound. The family went out for dinner, and the father and mother castigated him for not eating after he had gone through this tragic. Now, didn't all of this come out from Mr. Mickey afterwards? I mean, he didn't inform his counsel of that early on, did he? Of those events early on, did he? It came out not only just through Mr. Mickey. I don't think he was asked. The attorneys almost avoided asking him questions. He wasn't asked in general about his family. And it came out because on habeas, many more witnesses were interviewed who should have been interviewed previously but never were, and they revealed all of this. So it is not just Mr. Mickey. It's corroborating witnesses that we had. The problem was that the mitigation was basically good boy from good family turns toward drugs, and this doesn't explain why he committed the crimes. It's a situation that many people that reach adulthood have. They have a tragedy in their life, like their mother dies, but almost all of them, fortunately for society, don't turn to drugs or alcohol. But this mitigation is disfavored. As this Court said in the Mayfield case, juries are unlikely to favor defenses based on abuse of dangerous drugs or evaluating a defendant's culpability for violent behavior. On the other hand, the mitigation case that should have been presented that was available but was never discovered of the multigenerational history of mental problems and his traumatic upbringing. I'm not sure if you fully answered Judge Rawlinson's question about prejudice. I mean, assuming all of this, where was the prejudice? The prejudice was that a disfavored defense, mitigation defense, that the jury was not likely to buy instead of a defense that was favored. How do we know the jury was not likely to buy? It was consistent with the argument under the guilt phase. Well, and I guess one of the things that Ms. Kenwood will be talking about is that the argument in the guilt phase didn't jive with this, and it was an argument that should not have been presented. It was an argument that even the attorneys didn't believe in. But here, it didn't explain to the jury why he committed the crime. And it presented him as a person that just himself turned to drugs and alcohol. Maybe what I can do is quote one of the experts, Dr. Burstein, who said the jurors understand the difference between someone who brings on his own psychosis and someone who has the bad fortune to be born with a genetic predisposition to becoming schizophrenic. That's a crucial, not a minimal distinction. And maybe that's better said than anything I've said today, that a person who is schizophrenic, who has multigenerational mental health problems, is someone who perhaps is not totally responsible for what he does. Kennedy. Mr. McCabe, could I ask you to address on the issue of prejudice your views on whether there would be prejudice if the sexual deviancy evidence were also to come in? Well, I think, and I hope I'm answering your question, but Judge White was aware of that sexual deviancy. He was aware of some of it, but not all of it, wasn't that correct? He wasn't aware of the incest. Judge White, yes. I think he was aware of it. There is evidence of that in the records. He was aware of that. It was not hidden from him at all. Do you think that Judge White ever considered whether the sexual abuse by Mr. Mickey of his eight-year-old stepdaughter involved Item 2 of 190.3, as far as aggravating circumstances, the use or threatened use of force or violence? And how would that affect the balancing of prejudice? Well, I think he was aware of that, but I think also the Court must be aware that the trial judge was aware of that. There was a long discussion in Volume 50 of the reporter's transcript, and the judge made it very clear that it wasn't going to come in unless the petitioner opened the door. But doesn't the petitioner open the door by bringing in evidence of his dysfunctional family, when your own expert, Dr. Lisak, says that the incestual relationship that Mickey had with his mother contaminated all the relationships that he had during his life, including the relationship he had with the murder victim, Hanson? How do you keep it out? Because Dr. Lisak testified at the evidentiary hearing, and I think this is at pages 191 to 193 of the first volume of the reporter's transcript, that while he was aware of that, he considered it was an element in his report. None of his conclusions were dependent upon that evidence. So I think there's a lot of speculation to say that it would come in. It didn't come in at the trial. The trial judge made it very clear on a couple of occasions that he was not going to admit it unless the door were opened. Trial counsel did not open the door. And I would assume... Trial counsel didn't open the door because trial counsel, neither plaintiff nor defendant, brought up the dysfunctional family evidence. But if the dysfunctional family evidence comes in, how can one not hear the evidence of a member of that family, that is the mother, the incestual relationship and how that affects the other relations, as Dr. Lisak said? Well, if it did come in... And then we have the Belmontes v. Ayers situation of weighing whether the aggravating evidence would overcome the mitigating evidence and changing the jury penalty determination. I'm well aware of that. My answers would be that it's speculative that it would come in. If it did come in... Should we speculate on that or should we remand it to the district court to let the district court come to a conclusion after an evidentiary hearing? If the court is concerned about that, we would not oppose that. I think that probably rather than the court make a decision on that today, we would have no problem with it going back to Judge White for a further evidentiary hearing. He was aware of that evidence, and he still found prejudice. He didn't specifically in detail discuss that, but he was certainly aware of that. And there are cases like Belmontes, but in Belmontes and in a lot of cases, there was other aggravating evidence of prior murders, of prior violent conduct. In this case, even if that were to come in, which I think is speculative, there is nothing else. The defendant had no felony convictions. He had no murders. He had no violent conduct. So I think even when everything... You don't think that molesting an 8-year-old stepdaughter is violent conduct? I mean violent conduct other than that. Other than that, his record is exceedingly minimal. Counsel, do you think that your mitigating evidence would also militate against the death penalty for the slaying of the female occupant of the residence? Well, I think the experts said that the female was there. He was in whatever state he was in, a confused mental state, such that he killed her because she was at that exact point. To get back to the prejudice discussion, and I know my time is running, and I wanted to indicate that with regard to the mental health experts, they were woefully unprepared. And I think the extreme prejudice... You're talking about for the penalty phase? Yes, the penalty phase. Because they were unprepared, because they asked for many documents, reports, transcripts, names of witnesses they could contact to confirm or rebut what Mr. Mickey had told them. Defense counsel gave them nothing. And so the prosecutor, in his closing argument, said to the jury, the problem with this delusional baloney is that it's totally unverified by any other source, any other witness. And Dr. Burstein shared in Dr. Smith's ignorance. As Dr. Smith, he had reviewed none of the materials. He knew very little about the circumstances of the case. How can you render an opinion on a defendant's state of mind who doesn't have its facts? What was the delusion that was being referenced? Was that the relationship he had with the male victim? Was that the delusion that they were talking about? I think there were a lot of delusions. I think that there were delusions, Mr. Mickey, in the declarations that were presented to the district court here There was evidence that he ran through the woods. He thought he was Krishna. He would sit in a lotus style for 12 hours meditating, trying to make one eye focus on one person and another eye on another. There were a lot of delusions. But wasn't that centered around the relationship he had with the male victim, those delusions? I don't think some of it was. Not all of it was. The experience I described had nothing to do with it. It occurred in Alaska. But what I'm saying is, as Judge White found, the mental health experts were totally unprepared. They were hung out to dry. They didn't know any of the facts. And it was not through their fault because they had repeatedly requested defense counsel to provide them with all of this information and the attorneys never did. The experts, it allowed the prosecutor to be able to argue that the jurors should believe the testimony of the prosecution's expert witness and reject the defense witness. I think the lack of giving them the information is very, very similar to what happened in the Hovey case in the Ninth Circuit and is also analogous to the Hendricks case. I think, unless the Court has any additional questions on that, I should allow Ms. Kenwood a few minutes to talk. I assume the 11 minutes I have left includes the rebuttal? Yes. All right. So I will, unless the Court has additional penalty phase questions. Not at the moment, counsel. Thank you. We'll hear from your co-counsel. I would like to begin with addressing. Introduce yourself for the record, please. May it please the Court. Neoma Kenwood on behalf of Petitioner Mickey. Very well. I would like to begin by addressing Judge,   I would like to begin by addressing Judge Rawlinson's question about the whether the female victim was involved in that delusion. We're still talking about now the penalty phase? We are switching to guilt phase, but I think that Justice Rawlinson's question pertains to guilt. You know, people say there is no justice on the Ninth Circuit. We're judges, not justices. Your point is that the same issue arises in both the guilt and the penalty? Exactly, exactly. All right. Very well. Take it from there. All right. Mr. Mickey is a schizophrenic. And when a schizophrenic is in a psychotic state, a delusional state, as explained by our experts, Dr. Stonefeld, as also explained, I think, by Dr. Smith's declaration, a schizophrenic in a psychotic state is not able to think rationally. That person is propelled by irrational thoughts and delusions. But it doesn't mean that they are focused and they cannot get those thoughts out of their mind. Now, was he diagnosed as schizophrenic before trial? He was not. And that is because trial counsel failed to do a proper investigation, failed to do a thorough investigation. And that's part of the point of the penalty phase argument. But was it necessary for trial counsel to investigate in order for the mental health professionals to be able to make a diagnosis? It was necessary for trial counsel to begin an investigation so that they could give information to their mental health experts. Now, Dr. Axelrad agreed, all three experts in this case, Dr. Axelrad, Dr. Stonefeld, and Dr. Smith, they all agreed that Mickey was delusional and that he was psychotic. Now, they had different labels for the diagnosis. But they all agreed as to his behavior and as to the symptoms. Dr. Burstein was fooled into thinking that the delusions and the psychosis stemmed from drug use. And that's because trial counsel didn't investigate Mickey's background. Had they investigated Mickey's background, they would have found out there's schizophrenia in the family, there was a dysfunctional family life. And these are red flags to a mental health expert. But isn't that part of the mental health interview to get the family background and to get all of that? It's not the entire responsibility of the lawyer, is it, to give the information to the mental health professionals? Once the mental health professionals have the opportunity to interview the client, isn't part of it their responsibility to ferret out that information? A schizophrenic client is not going to be aware of all of the facts that are necessary. I, Douglas, Mickey didn't know that there was schizophrenia in his family. He didn't even understand the dysfunction in his own family. A schizophrenic person is going to do everything they can to minimize and deny their illness. But that's one of the features that doctors look for when they're interviewing a mental health expert. But as Dr. Burstein said, when I have all this suggestion from trial counsel that this defendant is abusing drugs to such an extent, the first thing that's going to pop into my mind is that the delusion in psychosis stems from drug use, not from mental illness. You can't diagnose mental illness without a thorough investigation of a client's background. That's the problem. You can blame the mental health expert, but you can't blame the mental health expert. But I think that Dr. Burstein made it very clear, had I known that there was not this drug use, not only did trial counsel tell him there was drug use, but they failed to provide him with the testimony of witnesses at trial. And that showed that, no, there wasn't such drug use. So he was misled by trial counsel's failure to investigate. He didn't have a legible copy of Mickey's confession. And then during the statements to Detective Landry, Mickey hallucinates during the middle of the statement. The judge. Kennedy. Counsel, you're down to 7 minutes, which is what you had indicated you wished to reserve. But it's your choice. Okay. I would like to end with the note that Doug Mickey did suffer, and he still suffers, from mental illness. And his illness was not something to ignore or ridicule. Trial counsel in this case did both. Had this... But just before you complete, wasn't there a problem in terms of presenting a mental health defense because there had already been a self-defense assertion to the officers? Was that the state of the record? Douglas Mickey made statements to Detective Landry that indicated self-defense. Everybody in this case knew that that was fallacious. It was ridiculous. And I submit that unlike the other cases, Turk v. White, where the alternative defense is actually there's some credibility, that trial counsel should have presented a credible defense instead of relying on statements. Defendants, unfortunately, defendants lie all the time when they make statements to police. That is unfortunately the state of the case. In this case, as explained by Dr. Mickey, people who are mentally ill lie. They lie as part of their illness. Or perhaps Mr. Mickey was unable to tell Detective Landry what was really going on because of Detective Landry's relationship with his family. Doug Mickey did everything he could in this case to try to minimize his mental illness. And I suggest that just because trial counsel didn't make a decision to present a self-defense, what happened was they said to the jury project, well, these statements are coming in whether we like it or not. What they should have done is they should have taken control of their case. They knew that in the penalty phase, they were going to tell the true story of what happened here. Their mental health experts were going to say, no, this wasn't self-defense. This guy was crazy. He was delusional. He was psychotic. This is why this crime occurred. You can't switch gears. They should have dealt with it in the guilt phase. They should have gone into the penalty phase with credibility. Instead, they tried to support, they tried to argue that the self-defense theory was reasonable when it was not. They knew it was not. You prevailed. You prevailed. Your side prevailed on the penalty phase. That is correct. We prevailed by just that. We'll have to leave it there. Thank you, counsel. Thank you. We'll hear from the State. Good morning. May it please the Court, Alice Luster on behalf of the Respondent. I'd like to address briefly the guilt issue first. In response to Judge Rawlinson's question, it's quite true. There is not necessarily an obligation for counsel to do essentially the mental health investigation. I think mental health experts diagnose people all the time without an army of investigators going out and finding out what's happened to whether there's a family history or not. They rely on the statements of the patient. In fact, both I think Dr. Burstein in talking about his preparation and being questioned about what he looked at and what he did not said, for example, that the detailed social history prepared by Ms. Gurevich, he didn't find it terribly important. The two interviews that Dr. Axel read, he didn't find terribly useful to him because he already had that information from Douglas Mickey. He was doing what mental health experts do. The other factor that we'd ask this Court to keep in mind is it's not simply a matter of coming in here and saying, well, we now have two defense experts who say that Douglas Mickey was schizophrenic, and we have another expert who says, well, you know, I looked at drugs, so that's where I went, and that we can just assume he was mistaken. Counsel also was faced with testing and opinions by other mental health experts prior to trial that found nothing, or at least nothing of significance. But opposing counsel said that the mental health professionals agree that he was delusional and psychotic. What's your response to that? Well, the defense retained mental health experts agree that he was delusional, that he was under this delusion as to the role that Eric Hansen was playing. The issue is what caused it, and it is not clear from the record that it was schizophrenia or anything beyond drugs and drug use. Although Dr. Lisak in his report references that, and it makes a kind of conclusory statement that Mickey exhibited signs of mental illness prior to his death, the only signs that anyone can cite to are his wearing of his mother's underwear at a very young age, which has the danger with it of leading into all of the sexual dysfunction and perversion that they were trying so hard to keep out, and that he would occasionally stare off into space. And we submit that the concept of a young child who occasionally daydreams about things and doesn't necessarily respond instantly when he's being spoken to by adults is not something that the jurors would have considered to be signs of mental illness at a young age. There is simply nothing in the record that truly supports that, particularly in light of all of the evidence that came out at the penalty phase regarding how good a student he was, how well behaved he was. There were no signs in his day-to-day functioning with anyone out in the world at large, certainly, that would support a finding that he was mentally ill from a very young age. What's your response to opposing counsel's observation that the traumatic childhood evidence should have been brought in? Well, it's two parts. Certainly, the, he did not have an idyllic childhood. But the evidence, when you go back through, the only evidence really of traumatic childhood as such is that's summarized by Dr. Lysak. And in his report, it relies very heavily on statements from Mickey himself, because as Ms. Gurevich noted in her social history paper at the time, Mickey was essentially the only surviving member of his family, at least of the close family. And since all of this is dealing with supposedly what was going on in the nuclear home between him, his parents, and his brother, he would be the only one in a good position to really talk about that. He had a grandmother that was still living. She testified at trial. And the counsel, when they're talking to these witnesses and their investigator is talking to these witnesses, they're getting a very consistent picture. They talked to some 40 different people and interviewed, had them interviewed, and along with the research that Ms. Gurevich did. And there were a few people that said, I don't want to talk to you, I'm not going to help him. But the ones that were willing to talk and testify were giving, on the whole, a very consistent picture of a well-behaved, well-mannered, hardworking, good student up until his tragedy struck his life. Now, in terms of the pets, the evidence that Dr. Lisak relies on for that is, again, Mickey's statements himself, something he never told his counsel about at the time of trial, or at least there's no indication in the record that he did. And the statements of one cousin regarding the death of the dog, who the cousin surmised did not die naturally, does not state, I saw the father kill the dog. He just, I don't feel that that dog died naturally, I don't believe the dog died naturally. I believe he was killed by the father. But that's hearsay, probably relying on any statements made by Mickey. And moreover, that cousin, if you look at his declaration, is a long-time heroin user, had been in and out of rehab, had had several convictions for drugs, so, again, is probably not the best reporter of things, and might not have made a very good witness, had he been called at the time. The evidence of abuse, such as it was, primarily centered around Ron, Mickey's out-of-control older brother. There is very little evidence that Mickey himself was abused. There was a statement by his godfather, Mr. Fleming, that he was locked in a closet. His declaration indicates that he observed that several times, but his testimony at trial was that he was told by Mickey's mother that they locked Mickey in a room as punishment. Are you arguing that these are all reasonable strategic choices made by counsel and, therefore, not ineffective? Well, Your Honor, I'm arguing simply that this childhood wasn't that bad. This is not a Wiggins case. This is not a Michael Williams case. This is not a Porter case. This is a case of a child who may have been locked in a room on one or two occasions. He probably got spanked a few times, and he certainly appears to have seen his brother get spanked severely, if not to a level of beating, and certainly that's not good. Where does this incest discussion that we heard earlier fit in? Well, and all of that's a part of it, too, Your Honor. Despite, we take exception to counsel's characterizations and Dr. Lysak's testimony in his deposition that he could have, you know, kind of ignored the incest. Dr. Lysak talks about the incest, and counsel was well aware of it at the time, at the time of trial. And they fought very hard to keep out any references to Mickey's sexual dysfunction, the incest with his mother, the exhibitionism where he was exposing himself to women, as well as the molestation of young girls, including his stepdaughter. But Dr. Lysak's report calls the relationship with his mother the single biggest influence of his life. And we submit it's simply impossible for any mental health expert to give a more expansive and detailed explanation of Mickey's mental health than was given without opening that door. There is no way to talk about Mickey's dysfunctional family if all you can say to the court --" Let me stop you there, Ms. Luster. Do you think, this goes to the issue of our scope of review and our ability to determine matters, do you think that we should remand this case to Judge White to determine whether if dysfunctional family evidence had been presented, A, would that open the sexual deviancy evidence? And B, would that sexual deviancy evidence be admissible as an aggravating factor under 190.3 paren B? And C, if it was admissible, would that have a reasonable probability to change the Your Honor, of course this Court can, has within its authority to do that. However, given this is particularly because this is a pre-AEDPA case and Forget about authority. What should we do? Should we make those determinations ourself or should we send it back to Judge White to make a determination? Because I don't think that Judge White had all the facts which we have been discussing before him when he made his determination. Your Honor, I think this Court certainly has sufficient information in the record on which to make the information. And we think that it can be done without a remand. That Judge White, in fact, made some findings that it might be, it was not unreasonable to want to exclude the information regarding the sexual dysfunction in the family. Well, what about that last portion of Judge Bea's comment? Is it, do you agree that Judge White did not have the information that we're hearing in open court today? I believe that it was all before him, Your Honor. I mean, it's all contained in various, if not directly and through testimony, at least it's contained in records that were exhibits before him. So I believe he had. So he had all the mitigating evidence which we can put under the label of family dysfunctional evidence. And he had all the evidence regarding sexual deviancy. Is it incest? You mentioned molesting young children other than the stepdaughter. Was there any evidence of that or was it only the stepdaughter? I believe that there's evidence in some of Mickey's statements. Well, it's documented in some of Mickey's statements, I believe, Your Honor, that were made a part of the records. He was molesting children less than his care? Yes. And then exhibitionism. That's correct, Your Honor. And all that was before Judge White? Yes, Your Honor. It was at least available to him in the records, yes. Keep that in mind, Mr. McCabe, and see if you agree with that. Okay. With regard to the penalty phase, this is not the typical IAC case that comes before most appellate courts where the attorney stands up and puts on one witness, two witnesses that say, well, yes, I knew him, he was a good boy, thank you very much, and leaves. This is not a case such as Porter involving one witness and the reading of part of the deposition when there was abundant evidence to present. This case, there was extensive mitigation involved. What Petitioner wants is a do-over. He doesn't like the outcome. Counsel made a choice. They presented a case that was consistent with what they were finding out, that, in fact, we submit presented a good theory to the jurors that they could understand and possibly comprehend that you have a boy who is good, who is coming from, who is growing up, who is able to function well, who does well in school, who is helpful, who is the good son versus the black sheep that his brother was, that everyone agreed that his brother was, and then tragedy strikes. He loses a half-brother. In other words, it's consistent with his guilt phase approach. That's correct, Your Honor. It's absolutely consistent with his guilt phase approach. And we submit in terms of the penalty phase, it's, again, something that the jurors could grasp, as opposed to a boy who has some pets killed and may have been locked in a room on a couple of occasions and who's got a family that may have some issues but who we've got several experts who have said that the State was certainly aware of, who said, you know, he's well-oriented as to time and place, he knows what's going on, we've got ample evidence of planning and preparation that went into this crime both before and after in terms of the cleanup to combat any issues of mental health. What about the observations of Judge White, who points out in his decision that counsel never told the experts some relevant information, and it kind of made them look hapless on the stand? Your Honor, I think that what also has to be looked at is in the time of trial, when the district attorney was going through with Drs. Burstein and Smith and trying to point out things that they had not looked at, some of their comments are significant in this respect. Dr. Burstein had a box of documents, and the DA was trying to obtain those documents so they could look at them to use on cross-examination. And Dr. Burstein said that there was probably a thousand or more pages there, but he went through 50 to 100 pages, found them tedious and boring. He had Ms. Gurevich's report. He didn't need most of it. He had Dr. Axelrad's interviews. He didn't consider them useful. There was nothing of import in them. So when what we've got is Dr. Burstein at the time of trial saying, I didn't even see, we find it seems at least somewhat less than credible that 20 years later he's coming and saying, oh, well, if I had only had, I could have done more. Dr. Smith, similarly, asked Dr. Smith, did you hear about the testimony of Ed Rogers? Well, it wasn't pertinent to my opinion. Did you hear about the Landry tape, the confession? I didn't feel it was material to my opinion. So you're suggesting to the Court that counsel did convey all of this background information, and it's a matter of the technical witness, the expert, discounting it for whatever reason. I think it's probably, I think it is clear from the record that they certainly did not have all of the interviews with the family that were later provided, although they're even, Petitioner now takes exception with whether or not they even had they given that information. Counsel makes a strong argument on that point. What's your response? The response, Your Honor, is that it is within the realm of the mental health expert to talk to the Petitioner, to look for things. We submit, one, that they didn't find it because it wasn't there to be found, and that Dr. Burstein, far from being fooled by this drug use, would certainly have had to rule out drug use in order to make a reasonable diagnosis of schizophrenia, something that couldn't be done on the basis of Mickey's history of drug use. That while it certainly might have been easier for the doctors if they had had some other things just handed to them, that from this record, it is not so clear as the doctors would have had Judge White think that they would have, in fact, utilized it, because it appears at least from their statements that the experts have the full medical history of the defendant in this case. I cannot say what was in Dr. Burstein's record. The record does not appear to say that they would have had any medical history of his family. There's nothing to say that in the record. And unfortunately, because of the way the record was developed with regard to this box of materials that Dr. Burstein dismissed as tedious, we don't know what was in that. Well, of course, the issue in this case is ineffective assistance of counsel. And the only relevant inquiry, it seems to me, is did counsel convey to the experts all of the information that would have been appropriate for their use in making their conclusions? And I come back. Did trial counsel in this case give over all of the information that eventually came out later? I don't believe that they had some of the information at the time that the experts so know they would not have had at the time all of that information. So why isn't that ineffective assistance of counsel? Because there's nothing to indicate, other than their statements 20 years later, that it would have made a difference, Your Honor. Not only because not only does it have to be deficient performance, it has to be prejudicial. No prejudice, in other words, is what you're saying. That's correct, Your Honor. Counsel, what's your response to opposing counsel's observation that presentation of self-defense was ludicrous and should have been discarded in favor of diminished capacity defense? Well, Your Honor, I think there's two problems. First of all, counsel correctly realized that they were in fact stuck with this statement coming in, that this was a statement that was given to the police early on, that Nikki voluntarily made these statements, made these claims of self-defense, and that those were coming in regardless. Now, the diminished capacity defense, they had two doctors who had found that he was oriented intelligent with no signs of disorder or organic damage that they would have had to fight against in terms of a diminished capacity defense. He found that Nikki was a reliable reporter with a good memory, which would, again, either show that he was correctly remembering his version of self-defense or that he lied to try to get benefit from the police. And if they totally discount the self-defense, then what they show is that Nikki knows what's going on and he's willing to manipulate the situation when it benefits him, which certainly isn't going to help him. And further, as Judge White found, counsel knew they were in an atmosphere, their jury pool was coming from an atmosphere where diminished capacity was frowned upon. It was technically available to Nikki because of the timing of his murders, but the California electorate had resoundingly rejected that as a defense. And Judge White correctly took that into account. That's something that counsel would have to consider in determining their strategy. Dr. Axelrad was not a good witness. Even the National Jury Project people that were helping counsel agreed that he was not going to be a good witness. Diminished capacity had no explanation for Catherine Blunt's murder. Dr. Burstein, one of their other experts, he said he had no desire to be involved in guilt because Nikki had done it. He didn't feel he could be helpful at the guilt stage. Dr. Axelrad also, there were two other things that were significant. He knew, based on Nikki's statements to him, that part of Nikki's plans, not only did he have some premeditation deliberation findings in there, but that Nikki intended as a part of this plan to get money to kill his wife's ex-husband. Because she and the children were on his life insurance. And again, that's something that had they gone forward with Dr. Axelrad and a diminished capacity defense, that certainly would have been subject to coming in. Dr. Axelrad also opined that under the right circumstances, he believed Nikki could kill again. That's not the type of evidence that's going to result in a successful diminished capacity defense. Given all of those factors, counsel properly went with what they had and what the Petitioner had forced upon them. Counsel, do any of these recent Supreme Court cases, and I'm thinking of the Bobbie case out of the Sixth Circuit, Belmonte's out of Vark Circuit, and Porter out of the Eleventh Circuit, these three cases all came down to the Supreme Court within the last two months. Is there any new learning that we should be made aware of here that would affect this case? Well, I think there is, Your Honor. First of all, both Van Hook, or Bobbie, and the Belmonte's case are both pre-AEDPA cases, so they apply in this case. They were not worrying about the added higher deferential standard that AEDPA imposes on the Supreme Court. And although Van Hook was specifically looking at the ABA guidelines, and Judge White did not apply those in this case, they, the thrust of the opinion is whether or not counsel must do everything, because that's essentially what the ABA guidelines call for. Counsel must leave no stone unturned in order to be effective. Okay, but the ABA guidelines aren't implicated in this case, are they? No, they're not, Your Honor. But, and although Van Hook was focusing specifically because they had been cited there, the underlying thrust of that is no stone unturned. And that's essentially what Petitioner is asking this Court to find. We have counsel who got information from some 40 different witnesses, some of whom are people that gave declarations in the district court, one of whom in particular, Moira Seed, is someone that they said, you know, they should have talked to. And in the district court, she gave a declaration. But she was talked to by their investigator. And at the time of trial, she said, I blame Douglas Mickey for his father's death. I hate him. Would not have probably been very useful to put her on in sentencing. Now, 20 years later, she may not be saying that she hates him, but that's what counsel had in front of them. There are a number of witnesses that they did put on who now are adding little, again, 20 years later, adding a little bit here and there. But they're substantially saying the same things. He's a good boy, a good student, a hard worker, very well respected, very, you know, well behaved. Looking out after his brother, probably embarrassed by his brother. His brother is the bad seed. Again, counsel had a lot of witnesses that they talked to. They had a lot of witnesses that they presented. They presented two mental health experts. They found two correctional officers to come in on the idea of rehabilitation and say that Douglas Mickey is a model prisoner since he's been with us waiting trial. He's uncovered rumors about possible danger to other inmates and reported that so that we can assure that didn't happen. He's making, trying to better himself. He's studying. He's talking to the prison teacher. More importantly, they brought in the mother of one of the victims. Eric Hansen's mother was brought in to testify on Mickey's behalf at sentencing. And through a lot of struggle and a lot of fight and objecting on behalf of the prosecutor and perseverance on the part of the defense counsel, she was finally allowed to get across to the jury that putting Douglas Mickey to death was not something that she wanted, even though he was responsible for the death of her son. She said it would not help her. It wouldn't make her feel any better. That's something that you virtually never see in death penalty cases. The parent of a victim coming in, being called on behalf of a defendant, and yet these counsel did that. Again, they're just simply, the prejudice is not here. Even if this court were to determine that counsel should have done things sooner, that they maybe should have found a few of these other people and brought out a little more information, the prejudice is not here. What they presented to the jurors, and this is where we disagree with Mickey's counsel now, they presented to the jurors a picture of a man who could be rehabilitated. A young boy who was good, who worked hard, who did well, but who through the tragic loss of his half-brother, his mother, whom he loved very dearly, his grandfather, his brother, the loss of his first marriage, all of these things led him to grief, which we'd submit that jurors would understand grief. They might even understand beginning to drink or do something to self-medicate to try to make that grief go away. And then he was introduced through his second wife to Eric Hansen, who got him more deeply into drugs, and who then created this atmosphere that led to the delusion that they put forward, that Eric was stealing his soul. And then what they showed was once Mickey was out of that environment, away from the drugs, he could be a model prisoner. He would be safe if locked up. Punishment would be adequate if he were locked up. That's the picture they presented to the jury. Now, in light of the brutal nature of these two murders and the absolute lack of any explanation for Catherine Blunt other than she had the misfortune of being there, the jurors had a good case to spare a man. But Mickey himself, through his actions in committing these murders, through his planning, through his desires to get money, just committed murders that could not be overborne. The behaviors, the less-than-idyllic childhood that falls far short of the torture cases that this Court normally sees would not have made the difference. Are there no further questions? No questions. Thank you, Counsel. Well, I would suggest that a strategic decision is approved only if there is an adequate and complete investigation, and there wasn't in this case. There was virtually no penalty phase investigation until a very short time before the trial, even though counsel had been appointed two years earlier. The mitigation case was presented that the Attorney General says was a good strategic decision. It was one that's been disfavored by this Court, and again, I'll refer to the unblocked decision in Mayfield, where they said the juries are unlikely to favor defenses based on abuse of dangerous drugs, because dangerous drugs are something that the person has control over. They can stop using drugs. They can go to detox or AA. But Judge White found in his opinion that a jury is more likely to be sympathetic with one who has an illness for which he's not responsible than one who induces his own psychotic symptoms by ingestion of drugs. And Mr. Mickey, Judge White found, was not responsible because of this multigenerational alcoholism and mental health. Counsel, but what about the other portions of the mitigation case, the victim's mother coming in, the testimony from the officials at the prison that he did well in prison and could be rehabilitated? What about those portions? I'm not saying that those few witnesses were bad choices, I think that, and I think bringing his grandmother in was a good choice. But what I'm saying is that there wasn't an adequate investigation to present the problems that he had, that this family relationship. They brought in one of his teachers, Nell Benson, and she testified. She was never prepared by the defense counsel. She went to his office. He basically threw her out. She testified in answer to the questions, but what she wanted to say and what she said in the declaration that she submitted for Judge White is that he was in the eye of a hurricane. He was not safe at home. His father would go off unreasonably, unexpectedly. His mother was no help either. She was a very strange woman. This is an inadequate investigation, but what would further investigation have brought up other than what we've known here? I thought the essence of your argument was that defense counsel knew a lot more than he ever told the expert witnesses. Am I misreading your argument? No, he knew more that he didn't tell the experts. Okay, so what would an investigation have done? Because although he knew more, he didn't know very much more. The records, the problem where the attorney, where the experts got into trouble is that Dr. Burstein believed that Mr. McKee was basically out of his mind on drugs at the time of the homicides. If you look at the transcript of the trial, the prosecutor brings up a number of things that indicate that he wasn't out of his mind at that time on drugs. And the doctor, two or three pages, says, well, no, I didn't know that. Well, no, I didn't know that. That would affect my decision. Is it important that he didn't know it because he didn't read the information, or is it important that he didn't know it because the information wasn't provided? The latter, and that's in response to the other. So your position is the information was not provided, it was not in the boxes of documents that were given? The boxes were more statements that McKee had made. There was absolutely nothing, and this is not only Dr. Smith and Dr. Burstein testifying, it's the two persons from the National Jury Project, that the attorneys provided absolutely nothing to these doctors. And that allowed him, as I said before, the prosecutor to say in his closing argument, these doctors don't have the right picture. They don't have any information. How can they render a decision? Our expert had all the information, which is true. The prosecutor presented the information. But defense counsel provided them nothing, and that is unrebutted, it's in the record testimony of four witnesses. I don't want to court to think that the diagnosis of schizophrenia is something that just doctors 20 years later came up with. As soon as Mr. McKee got to San Quentin, he was examined by a psychiatrist at San Quentin who diagnosed him as a schizophrenic. Thank you, counsel.
judges: O'scannlain, Rawlinson, Bea